MURPHY v. HARRISON GRANITE CO. (No. 7604.)

(Supreme Court, Appellate Division, First Department. July 9, 1915.)

1. BROKERS ⬤⟞86—ACTIONS FOR COMPENSATION—EVIDENCE.

In an action for commissions for procuring a contract to erect a mausoleum, wherein it was urged as a defense that plaintiff's assignor had entered into similar contracts with defendant's competitors, a finding that such commissions were voluntarily offered *held* against the weight of the evidence.

[Ed. Note.—For other cases, see Brokers, Cent. Dig. §§ 116–120; Dec. Dig. ⬤⟞86.]

2. BROKERS ⬤⟞65—DUTIES OF BROKER—CONFLICTING INTERESTS.

Plaintiff's assignor, representing that she was intrusted with a commission of awarding a contract for the erection of a mausoleum, obtained from defendant an agreement to pay her a commission of 10 per cent., with the understanding that the contract was to be awarded without competition. Without defendant's knowledge she procured similar contracts from other monument dealers, also representing to each of them that there was to be no competitive bidding. The contract was awarded defendant under competition, and plaintiff's assignor brings action for commissions. *Held* that, since an agent cannot take upon himself incompatible duties, or act in transactions wherein he has adverse interest or employment, plaintiff was not entitled to recover.

[Ed. Note.—For other cases, see Brokers, Cent. Dig. §§ 48–50; Dec. Dig ⬤⟞65.]

Appeal from Appellate Term, First Department.

Action by Timothy J. Murphy against the Harrison Granite Company. From a judgment of the Appellate Term, affirming a judgment for plaintiff, defendant appeals by permission. Reversed and rendered.

See, also, 151 N. Y. Supp. 1131.

Argued before INGRAHAM, P. J., and CLARKE, SCOTT, DOWLING, and HOTCHKISS, JJ.

Cabell & Gilpin, of New York City (Hartwell Cabel, of New York City, of counsel), for appellant.

J. Campbell Thompson, of New York City (J. Brownson Ker, of New York City, of counsel), for respondent.

CLARKE, J. The action is for the defendant's failure to pay a commission alleged to be due under a contract between defendant and plaintiff's assignor, based upon the contract price of a mausoleum erected by the defendant for a third party. The case has been twice tried in the City Court. The first trial resulted in a directed verdict for the full amount claimed by the plaintiff. The judgment was reversed by the Appellate Term. 81 Misc. Rep. 223, 142 N. Y. Supp. 517. On the second trial, both sides, having moved for a directed verdict, submitted the entire case to the court, which made a decision ordering judgment for the plaintiff. Upon appeal the Appellate Term affirmed without opinion.

The complaint alleges that on the 7th of March, 1911, the defendant entered into an agreement with one Jeanne C. Irwin-Martin, where-

by said defendant promised and agreed to pay her, for procuring for said defendant a contract for a memorial, a commission of 10 per cent of the purchase price thereof; that thereafter, and through the introduction, instrumentality, and efforts of the said Jeanne C. Irwin-Martin, the said defendant received and accepted a contract from W. F. & S. M. Whiting for the erection of a mausoleum at a price of $12,000; that said mausoleum was constructed by said defendant in accordance with the terms of said contract; that under the terms of the aforesaid agreement of March 7, 1911, the said Jeanne C. Irwin-Martin was and is entitled to receive the sum of $1,200 as and for her 10 per cent. commission in procuring and placing said contract in the defendant's hands; that no part thereof has been paid; and that she had assigned her claim to the plaintiff.

The answer sets up an affirmative defense. It is alleged that at the time of making the contract Miss Irwin-Martin represented that she was in a position to and could obtain for the defendant the contract for the building of a mausoleum desired by a friend of hers without competition; that upon the understanding that there was to be no competition, and that the price would be satisfactory, defendant agreed to pay a commission of 10 per cent.; that at or about the time this agreement was entered into Miss Irwin-Martin, without notifying the defendant, called upon a number of defendant's competitors, and upon similar statements obtained a like contract from each of them; that defendant was ignorant of these facts. The fraud and bad faith of plaintiff's assignor in making similar arrangements for a commission with defendant's competitors while under contract with defendant to use her best efforts in its behalf is a defense to her claim for her commissions.

The court found: That the defendant entered into an agreement with Jeanne C. Irwin-Martin as follows:

"Dear Miss Irwin-Martin: In accord with our conversation, I beg to confirm the agreement that, should you succeed in placing in our hands a contract for a memorial, we will pay you ten per cent. (10%) commission—provided, of course, that the contract is acceptable to us as to responsibility and price."

This was dated March 7, 1911. That thereafter the said Irwin-Martin procured for the defendant from W. F. & S. M. Whiting a contract for the erection by the defendant of a mausoleum for the said Whitings at the price of $12,650. That plaintiff received from said Whiting said sum. That by reason of having procured said contract for the defendant she was entitled to a commission of 10 per cent. to wit, $1,265, with interest from May 15, 1911.

The plaintiff's sole witness was Miss Irwin-Martin, who testified that she would receive the entire amount of the proceeds of this suit, less legal expenses. The treasurer of the defendant testified:

That in the early part of March, 1911, Miss Irwin-Martin came to the office and asked whether they built mausoleums outside of the city of New York. That she had a commission to execute for a family in Massachusetts. "She asked me what commission I would pay, and I said it depended naturally upon the amount of the contract and how it was handled, whether it was handled with or without competition. She said there would not be any competition, because she had it in hand absolutely, and she controlled the whole

business. I said in that case we would pay her 10 per cent. commission. I asked her if that would be satisfactory, and she said, 'yes.' * * * This conversation about commissions happened right in the office and one of the very first things that happened." That some weeks later, after he had submitted plans and drawings and had learned from Mr. Whiting personally that he was taking various estimates from other people along the same line, and knew there was going to be competition, he had an interview with Miss Irwin-Martin about this matter. "I told her distinctly she had represented to us that there would be no competition, she had the handling of this case; and I told her under the circumstances, if there was going to be competition, we would have to waive the commission of 10 per cent. and give her the best I could, which, at that time, I thought might be $300. I said that to her, but Miss Irwin-Martin didn't think that was satisfactory. I told her I might raise it to $400 if I got the business and the margin of profit warranted it. I said I would do the best I could to get that much for her, but I abrogated the first original agreement. She said that would be satisfactory, if that was the best we could do. Q. Did you know at that time anything about her visits to other people? A. No, sir. Q. Did you hear her testimony here, in which she said to you, at the first interview, she had called upon various people? A. No, sir; she didn't say that to me, as near as I can recall it; that wasn't spoken of. * * * Q. State whether this contract which was finally entered into .with the Whitings was entered into· by your concern under competitive conditions. A. Yes, sir.".

Mr. Presbrey testified that he was president of the Presbrey-Coykendall Company. He narrated a similar interview:

"She said that this family would leave everything to her, and undoubtedly the contract would go to the firm whom she would recommend. * * * There would be no competition in this case. It would go where she advised. * * * I said, 'That being the case, we can pay you 10 per cent. commission.' She said, 'All right.' She wanted a letter to that effect."

The contract with the Presbrey-Coykendall Company was dated March 7, 1911, the same date of that of the defendant, and was addressed to Miss Irwin-Martin:

"We hereby agree to pay you ten per cent.· (10%) commission on the retail price of any order for a mausoleum or memorial you may secure for us, unless another arrangement should be made in writing. Commission to be payable in installments as the payments are made on the work while in process of erection. This is a most liberal commission, particularly on such large work, and it would be impossible to pay it if there were competitors. It will not be unfair in any way to the customer to exclude other bidders, for he would obtain from us the finest material and workmanship and the utmost procurable in the way of design, on which no commercial valuation can be estimated."

He testified to an interview with her some weeks later, when he had discovered the designs of other firms:

"I said: 'You informed me that you were going to use all of your influence for us and that there would be no competition?' She said, 'Yes.' I said, 'Under the circumstances, I think it very strange that so many other very well known mausoleum builders in New York are on this case in Holyoke; did you go to any other firm in New York and make such arrangements as you did with me?' She said, 'No, sir; I told you I would use all my influence for you; I did so.' "

Mr. Leland testified:

That he was connected with the firm of W. W. Leland Company. He had a conversation with Miss Irwin-Martin, but most of it was had with an employé, Mr. Vanderpool, who was not now with his company. "Q. State what

she said as near as you can tell. A. It was handling a mausoleum for some people in Massachusetts, and it was entirely in her hands. Q. Did she tell you that? A. Yes, sir; * * * that she had the placing of the mausoleum and it was all in her hands." The letter of the Leland Company was dated March 2, 1911 (five days before she went to the defendant): "It is agreed by and between us that, should we, through your effort, directly or indirectly, close a contract with the people with whom you are dealing, and with whom you put us in touch, we will pay you a commission of 5 per cent." And there was a subsequent letter of March 27th: "Since your call at this office, and our recent communication, we have thought that possibly we haven't offered you as large a commission as you possibly might get from some one who would charge considerable more money for the work. Now, we do not want any more than a legitimate margin of profit; but we do want business, and we are greatly impressed with the size of the mausolum which your principals contemplate building. We are consequently going to make you a proposition of 10 per cent., providing you put us in touch with your principal and we are successful in getting the contract. * * * "

### Mr. Hoagland testified:

That he was connected with the C. E. Tayntor Granite Company and recounted a similar transaction. "She said she could secure that order for me. I asked her. 'Are you going to work for me, or are you going to work for other people?' She said, 'Surely, I will work for you alone.' I said, 'In that case I probably could afford to pay you 10 per cent.' She asked me if I would put that proposition in writing, and I said I would, and therefore we wrote her that letter, which I think is dated March 6th. That letter is as follows: 'Referring to our conversation at this office a few days ago, would say that if you will use your influence to aid us in getting the contract for the mausoleum to be erected in Massachusetts which you talked to the writer about, we will pay you 5 per cent. on the contract price, and if you are instrumental in our securing the order without competition we will pay you 10 per cent. on the contract price; the commission to be paid you at such time or times as we receive our payments on this work.' "

It should be borne in mind that the complaint alleges that a commission was to be paid "for procuring for said defendant a contract," and "that * * * through the introduction, instrumentality, and efforts of the said Jeanne C. Irwin-Martin said defendant received and accepted a contract," and that the court has found that "the said Jeanne C. Irwin-Martin procured for the defendant a contract for * * * the erection by the defendant of a mausoleum," and "that by reason of having procured said contract for the defendant" she became entitled to the 10 per cent. commission.

[1, 2] Miss Irwin-Martin denies that she made the specific promises to each of these builders that she would work solely for them, as testified to, and she denies that she said there would be no competition, and she now asserts that she did not ask for commissions, but that they were voluntarily offered by them. But the finding based upon her testimony is overwhelmingly against the weight of the evidence given by four witnesses and contrary to the written documents in the case. It is true that a broker is sometimes entitled to commissions from vendor and vendee; but both must understand that he is to be so paid, and his contract is simply to bring them together. But that is not the situation here. She is not claiming a commission from vendor and vendee, to whom she had disclosed her mutual relation, and each of whom had agreed to pay her. She had represented to a number of people that she would use her efforts and influence solely in behalf of each,

without the knowledge of the others, and she had made with each a written contract based upon the exclusive agency. She secretly agreed to be the agent for each to procure the contract in competition with the others. To each of them she owed the utmost of good faith, and she could not honestly serve them all. She now says that she had no power in the matter; but she advanced to the several witnesses, according to the testimony, the proposition that she had the choice of a contractor entirely in her own hands.

It seems to me that the language of Chief Judge Ruger in Murray v. Beard, 102 N. Y. 505, 7 N. E. 553, is precisely applicable to the facts presented by this record. That was an action by a timber broker to recover commissions for services alleged to have been rendered for the defendants in effecting a sale of about 4,500 piles. The plaintiff, learning that a steamship line was about to build a pier, visited the several dealers in piles in New York and Brooklyn and obtained prices therefor, and under the inducement that he would act for them respectively in securing the sale obtained their promises from each that if he secured a sale for such dealer he should receive a commission of 25 cents on each pile sold. He did not inform the dealers of the name of the intended purchaser, or the fact that the contract could be obtained only by competitive bidding, or that he had effected a similar understanding with other dealers. On the trial the plaintiff was nonsuited, upon the ground that there was no consideration for the promise to pay commissions:

"We think the judgment was properly ordered on that ground, and that it can also be sustained upon the ground of fraudulent suppression of material facts by the plaintiff in making the contract, as well as that it was contra bonos mores. The plaintiff, while assuming to act for the defendants in obtaining the contract of sale, was in fact under equal obligations, to competing dealers, to assist them in effecting the same sale. Thus, if the plaintiff's services could have been of advantage to any one, he was under the necessity of being treacherous to one employer or another. An agent is held to uberrima fides in his dealings with his principal, and if he acts adversely to his employer in any part of the transaction, or omits to disclose any interest which would naturally influence his conduct in dealing with the subject of the employment, it amounts to such a fraud upon the principal as to forfeit any right to compensation for services. * * * It is an elementary principle that an agent cannot take upon himself incompatible duties and characters, or act in a transaction where he has an adverse interest or employment. * * * In such a case he must necessarily be unfaithful to one or the other, as the duties which he owes to his respective principals are conflicting, and incapable of faithful performance by the same person. * * * Such conduct is violative of the plainest principles of morality and fair dealing, and cannot be sustained by a court of justice. * * * He was under contract obligations to others, as well as to the defendants, and it does not lie in his mouth to allege that he intended to defraud others for the benefit of the defendants."

Applying the doctrine so laid down, the plaintiff was not entitled to recover. The determination of the Appellate Term and the judgment of the City Court appealed from, and the decision upon which it was made, should be reversed, the defendant's proposed findings of fact and conclusion of law adopted, and the complaint dismissed, with costs in all courts to the appellant. All concur.